IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BIG G EXPRESS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:08-cv-0318 |
| ) | |
| LEVITON MANUFACTURING COMPANY, INC ) | Senior Judge Thomas A. Wiseman, Jr. |
| and AMERICAN INSULATED WIRE CORP., ) | |
| ) | |
| Defendants. ) | |

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is the Motion for Summary Judgment as to all claims against it filed by defendant American Insulated Wire Corp. ("AIW") (Doc. No. 66).[1] The motion has been fully briefed and is ripe for consideration.

The facts in this case are basically undisputed, though the inferences to be drawn from some of these facts are the subject of dispute. Defendant AIW, a business incorporated in Rhode Island with its principal place of business in Massachusetts, manufactures wire products. Plaintiff Big G, a Tennessee corporation with its principal place of business in Tennessee, is a shipper. Sometime before March 5, 2007, AIW agreed to sell a large quantity of insulated wire to a third party (not a party to this lawsuit) located in Tennessee. AIW and the purchaser agreed that AIW would arrange for the shipment of the product directly from AIW's South Attleboro, Massachusetts facility to a consignee in East Tennessee. To ship the load, AIW contacted non-party Zip Carriers, Inc. to arrange for transportation services. Zip Carriers, acting as a broker, contracted with Big G to haul the subject shipment. Big G obtained the non-negotiable details regarding the shipment—pick-up time, delivery time and so forth—from Zip Carriers. Big G and Zip Carriers negotiated the freight charges to be paid to Big G for its services. After Zip Carriers and Big G reached an understanding of the applicable freight charges, a document to which the parties refer as the "Rate Confirmation Sheet" was executed by representatives of Zip Carriers and Big G. (See Doc. No. 66-5.) The Rate Confirmation Sheet states that it is a contract between the broker, Zip

---

[1] All claims against defendant Leviton Manufacturing Company, Inc. have been dismissed without prejudice pursuant to a joint stipulation and agreed order by all parties to this action. (*See* Doc. No. 48.)

Carriers, and the carrier, Big G.  At the top of document appears the following statement in large, bold letters:

> **DRIVER IS RESPONSIBLE TO MAKE SURE FREIGHT IS PROPERLY SECURED PRIOR TO LEAVING SHIPPER**.

(Doc. No. 66-5.)

On March 5, 2007, Big G dispatched its employee Joel Ulmer to AIW's facility to pick up the load of insulated wire.  Ulmer holds a commercial driver's license and has twelve or more years of experience in driving trucks.  Ulmer has testified that he is aware that a truck driver has a duty to assure himself, to the extent practicable, that a load he carries is adequately secured.

AIW's employees loaded the wire spools into Big G's trailer while Ulmer stayed in the cab of his truck.  At no point did any AIW employee or agent ever tell Ulmer that he could not watch the reels of wire being loaded.  Likewise, AIW did not encourage Ulmer to watch or participate in the loading process.  Typically, in fact, drivers have little or no control over AIW's loading and securement process.  AIW generally instructs drivers to wait in their cabs or in a "drivers' area" inside AIW's facility.

While Ulmer waited in the cab, two AIW loaders loaded nine wooden reels of insulated wire, each weighing over 4,000 pounds.  The reels were secured using various lengths and combinations of wooden 4' x 4's, 2' x 4's, wooden "chocks" and nails.  The loaders as well as their supervisor all had many years of experience working for AIW, specifically in the area of loading and securing cargo of the type at issue here.  AIW's employees were satisfied by the time they finished that the load was adequately secured and should not shift during transit.  Ulmer saw the load as he was closing the door and observed that the truck looked full all the way to where the back reel was and appeared to be secured.  He did not get up into the truck and attempt to inspect every part of the securements.  He nonetheless testified that he had been "impressed" by the efforts AIW undertook to secure the load.  Ulmer closed the trailer doors and sealed the load.

After AIW's employees were finished loading the cargo, they printed and handed Ulmer a copy Bill of Lading No. 35534.  The Bill of Lading describes the goods being shipped and instructs Big G as to where it should deliver the goods.  It indicates that AIW is the party to be billed for shipping and that Zip Carriers, Inc. is the broker.  (See Doc. No.66-6.)  Ulmer signed the Bill of Lading on behalf of Big G.  Next to his signature on the Bill of Lading, Ulmer marked "SL&C," which the parties agree means "shipper load

and count" or words of similar import, that is, that the shipper loaded and counted the shipment without the driver's participation or input. It is clear that the purpose of this language is to protect a carrier from liability based on an incorrect quantity of goods as well as against damage caused to the *cargo* during transport. It does not necessarily relate to the allocation of liability for damage caused to the transporting vehicle during load shifts.

Ulmer departed AIW's facility and headed south on I-95 toward Providence, Rhode Island, a metropolitan area known for heavy, stop-and-go traffic. Within approximately fifteen minutes of leaving AIW's facility, Ulmer was forced to come to a fairly abrupt stop on the interstate when the vehicle in front of him came to a complete stop. Ulmer estimates he was going about forty miles per hour at the time. He did not impact the vehicle in front of him, and there is no suggestion in the record that Ulmer was driving negligently or at an excessive speed. (The truck did not jack-knife, and there were no skid marks on the road.) In any event, when he came to a stop, the 40,000-pound load in the trailer thrust forward approximately twenty feet, breaking through the securing restraints, breaching the front of the trailer and barreling into the sleeper berth of the cab, seriously damaging both the trailer and the cab as well as some of the wire reels. No person, fortunately, was injured.

The issues raised by AIW's motion are: (1) which party bore the burden of ensuring the load of wire reels was adequately secured; (2) whether the language of the Rate Confirmation Sheet operated to release AIW from any liability related to securement of the load; (3) whether, under Massachusetts law, Big G is required to present expert testimony in order to prevail on its claims; and (4) whether the notation of "SL&C" on the Bill of Lading operated to render AIW contractually responsible for the shifting of the cargo and resulting damage. Based on the record before it, the Court finds that:

(1) The question of who bears the burden of ensuring adequate securement of the load depends on whether the defect in securement, if any, was latent or patent, and there is a genuine issue of material fact as to whether a defect existed and, if so, whether it was in fact latent or patent. *See United States v. Savage Truck Line*, 209 F.2d 442, 445 (4th Cir. 1953) ("The general rule is that [the shipper] becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper."); *Franklin Stainless Corp. v. Marlo Transport Corp.*, 748 F.2d 865, 868 (4th

Cir.1984) (quoting *Savage*); *Pierce v. Cub Cadet Corp.*, No. 87-5936, 875 F.2d 866 (unpublished) (6th Cir. May 9, 1989) ("Only if and when a shipper assumes the responsibility for loading its property on a motor vehicle, does it have the duty to exercise reasonable care to see that the load is properly secured."); *Smart v. Am. Welding & Tank Co.*, 826 A.2d 570, 575 (N.H. 2003) (remanding for determination of whether loading defect was latent or patent); *Decker v. New England Pub. Warehouse, Inc.*, 749 A.2d 762, 766 (Me. 2000) (affirming summary judgment for the shipper as to the carrier's negligence claim, based on the *Savage* rule, where the loading defect was patent and observable).

(2)  AIW did not waive its ability to raise the defense of release by failing to raise it in its Answer to the Complaint, *see Seals v. GMC*, 545 F.3d 766, 770 (6th Cir. 2008); Fed. R. Civ. P. 8(c).  However, the language in the Rate Confirmation Sheet stating "DRIVER IS RESPONSIBLE TO MAKE SURE FREIGHT IS PROPERLY SECURED PRIOR TO LEAVING SHIPPER," did not operate unambiguously as a release of liability; rather, it is ambiguous as to both scope and meaning, giving rise, at a minimum, to a question of fact as to whether the parties intended the language to operate as a release of liability, even for negligence, on the part of AIW.  *Cf. Hermes Automation Tech., Inc. v. Hyundai Elec. Indus. Co.* 915 F.2d 739, 749 (1st Cir. 1990) (applying Massachusetts law, holding that where the language of a release agreement was ambiguous, the plaintiffs were entitled to have it "construed in light of the extrinsic evidence on the issue of what claims . . . the parties to the agreement intended to release"); *LaFleur v. C.C. Pierce Co., Inc.*  496 N.E.2d 827, 832 (Mass. 1986) (holding with respect to the construction of a release agreement that "the intention of the parties is controlling, and the relevant inquiry is whether there has been a conscious and deliberate intention by the parties to release claims for injuries," and that extrinsic evidence of intent is required to ascertain the parties' intent where the release language is ambiguous).

(3)  Big G does not need expert testimony in order to support its argument that the load was inadequately secured but that any defect in securement was latent.  The test for determining whether a particular matter is a proper one for expert testimony is whether the testimony will assist the jury in understanding issues of fact beyond their common experience.  *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 788 N.E.2d 522, 536 (Mass. 2003) (citing *Simon v. Solomon*, 431 N.E.2d 556 (1982)).  The standard of care here at a minimum required adequate securement of the load such that a routine, if relatively

precipitous, stop would not dislodge the load. As a matter of common sense, if the securement of a load of wire reels were beyond a jury's understanding, the loaders engaged in the task would like be required to take courses in advanced physics to qualify for the job. It is quite clear that everyone involved in loading the wire reels in this case, including both AIW's and Big G's employees, all received on-the-job training, and they considered proficiency in the art of securing a heavy load to require nothing more than common sense and experience. This case does not involve products liability nor professional care of the type that Massachusetts courts have held to require expert testimony. *See, e.g.*, *Herbert A. Sullivan, Inc.*, 788 N.E.2d at 536 (holding that the standard of reasonable conduct for an insurer acting pursuant to its contractual obligation to defend any claim made against its insured required expert testimony where the standard was not specifically set forth in the contract, as the standard was analogous to the standard of care owed by other professionals to their clients). *See also McCue v. P. Gioioso & Sons, Inc.*, No. 04-255, 2006 Mass. Super. LEXIS 4 (Mass. Super. Ct. Jan. 9, 2006) (holding that expert testimony was required to prove that the defendant's failure to erect warning signs indicating that a traffic light was upcoming was a breach of the standard of care); *Harris v. Magri*, 39 Mass. App. Ct. 349, 353, 656 N.E.2d 585 (1995) (expert evidence required to show failure to meet standard of care in legal malpractice action); *Wielock v. Webster Credit Union*, [No Case Number in Original], 1990 Mass. App. Div. LEXIS 7 (Mass. App. Div. Jan. 8, 1990) (expert testimony required to prove professional standard of care applicable to architects); *Enrich v. Windmere Corp.*, 616 N.E.2d 1081, 1084 (Mass. 1993) (finding that the presence of a defect in a fan that was the source of a fire causing plaintiff's injuries could not be inferred in the absence of expert testimony).

In addition, the facts in evidence here are sufficient to permit the finder of fact to infer negligence on the part of the defendant. In Massachusetts, the doctrine of *res ipsa loquitur* does not overcome the lack of evidence of the defendant's negligence but permits a trier of fact to draw an inference of negligence in the absence of a finding of a specific cause of the occurrence when an accident is of the kind that does not ordinarily happen unless the defendant was negligent in some respect and other responsible causes including the conduct of the plaintiff are sufficiently eliminated by the evidence. *See Enrich*, 616 N.E.2d at 1084 (citing Restatement (Second) of Torts § 328D(1)(a) (1965); *Rafferty v. Hull Brewing Co.*, 215 N.E.2d 85 (1966); *Ginsberg v. Metro. Transit Auth.*, 131 N.E.2d 919 (1956); 1A Frumer

& Friedman, Products Liability § 2.26 [3], at 2-1553 (1960 & Supp.1988)).  The jury must be able to find, either by expert evidence or by their own common knowledge, that the mere occurrence of the accident shows negligence as a cause.  *Enrich*, 616 N.E.2d at 1085 (citing *Coyne v. John S. Tilley Co.*, 368 Mass. 230, 235, 331 N.E.2d 541 (1975); *Ginsberg v. Metro. Transit Auth.*, *supra*; *Roscigno v. Colonial Beacon Oil Co.*, 294 Mass. 234, 235, 200 N.E. 883 (1936)).

(4)  The "SL&C" notation on the Bill of Lading only operated contractually to shift responsibility for negligent loading and securement in situations where the items being shipped were themselves damaged in transport as a result of improper loading or securement.  *See* 49 U.S.C. § 80113(c).  That issue is not pertinent here.  More to the point, this action sounds primarily in tort; not contract.  There is no evidence that AIW breached an obligation to load and secure the shipment of wire reels.  Rather, the question is whether it breached a duty in the performance of that contractual obligation, giving rise to potential tort liability.  *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 788 N.E.2d 522, 531 (Mass. 2003) ("When a party binds himself by contract to do a work or to perform a service, he agrees by implication to do a workmanlike job and to use reasonable and appropriate care and skill in doing it. . . .  Although the duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort." (quoting *Abrams v. Factory Mut. Liab. Ins. Co.*, 10 N.E.2d 82, 83, 84 (Mass. 1937)).

In sum, material factual disputes preclude summary judgment in this case.  AIW's motion for summary judgment is therefore **DENIED**.

It is so **ORDERED**.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge